Mr. Meadows, along with 563 other drilling rig workers employed by Pelley Latshaw Drilling Company, lost their jobs with no prior rig warning. As a result, Mr. Meadows filed suit under the Worker Adjustment and Retraining Notification Act. Prior to class certification, Mr. Latshaw's case was erroneously dismissed on summary judgment. Today, we address two points of error, and hopefully I'll be able to get to a little bit of policy as well about the WARN Act. The first point of error is whether the district court properly determined that no reasonable jury could find in Mr. Meadows' favor with regard to a particular theory of liability, and that would be 20 CFR 639.3 I-3. Obviously, it's our contention that it was an error, but important is that 20 CFR 639.3 I-3 is just one of eight definitions of single-sided employment pursuant to the WARN Act. Now, these are all independent paths to liability, and they each have different prongs and tests. In addition to this particular test, which permits plaintiffs under the WARN Act to aggregate non-contiguous single-sided employment, we also pleaded what's known as the outstation employee exception, that's six, and the truly unusual business exception, that is eight. We also pleaded that each drilling rig could be considered an operating unit within a single-sided employment pursuant to a plant closing as opposed to a mass layoff. So the next point of error is, was the court correct in dismissing those alternate paths to liability based on a narrow ruling solely regarding reasonable geographic proximity? Now, Judge Reveley very recently, in 2013, decided the Davis v. Signal International case and remarked on the relative paucity of WARN decisions. Things have not gotten much better. There's a couple of interesting developments, but it is a really not very litigated case, kind of case. So in point of error one, we're looking at this reasonable geographic proximity issue, and so what we have is we have three potential single sites of employment, one in Midland in the Permian Basin, and then two in Oklahoma in the Anadarko Basin and the Arcoma Basin. Take a little breath there. It's going quickly. Now, we also pleaded when we were seeking class certification that it may actually be proper for the class definition to later be confined so that the single sites of employment revolve around who is the drilling superintendent in charge of a cluster of drilling rigs, just to keep that straight. But the problem was where the court respectfully went wrong was in running afoul of the recent Hindson decision when it ignored certain evidence presented by plaintiff in terms of how close the rigs were and favored defendant's evidence. For instance, it ignored evidence regarding plaintiff's contention that the rigs were close enough for people to drive back and forth, including plaintiff, drove back and forth between drilling rigs in the Midland area, that rig superintendents managed five drilling rigs at a time and were able to visit all those rigs in one day. The fact that a drilling superintendent would not manage a rig in a different geographical area, for instance, he wouldn't manage a rig in the Permian Basin as well as in the Anadarko Basin. Those facts were all ignored in coming to the conclusion that no juror could find reasonable geographic proximity between any of these drilling rigs. Now this is where things get a little bit interesting because there was a recently decided case, the Voisin v. Axis drilling case. In that case, it involved offshore drilling rigs. So it's an interesting parallel, but in that case, the judge refused to come to the conclusion that there could be no reasonable geographic proximity between those offshore drilling rigs because they very frequently were in close geographic proximity in visiting a regional yard. It's called the, I'm going to mispronounce, I'm sorry, I'm not from Louisiana, Puma office. It's tantamount to the district yards in this case. So that's the same fact. The land-based drilling rigs were very frequently in the yard, so in keeping with the Voisin case, geographic proximity could be a factor here. Therefore, the court was in error. Now, Appalachia said, well, judges, you're all here, so why don't you go ahead and knock the case out on one of the other three prongs? Unfortunately, that's impossible because the other three prongs contain disputed issues of material fact. Going back to Voisin, it's really interesting because what happened there, that's how the case was dismissed on summary judgment, was in sharing of employees between the drilling rigs. What happened was that the workers on the offshore rigs would come back to the yard, work on the rigs there, and then would go back on the same rig. Here it's different because my client, Johnny Meadows, transferred repeatedly between drilling rigs. One of his rigs got stowed at the yard, and then he was assigned to a new one. That happened a myriad of times. There were also a myriad of times when he worked on different rigs temporarily. If you look at the United Foods case, it shows that those kinds of transfers are illustrative of common sharing of employees. What was the most number of people that worked on a rig at any given time? I believe that 28 was the most that my client testified to. However, based on the common sharing of employees and equipment, that's also a contested fact, and common management, which reveals the common operational purpose. You're also going to compare it with cases like Viator, where there's disparate retail locations. In those cases, sharing of employees was not found, where in a 20-year period, only 20 percent of those employees were ever permanently transferred. Here we have a two-year period where my client was transferred 14 times. Counsel, there are a lot of things you want to cover here, and there are different sorts of cross-fertilization of the rigs in different ways, with employees or with equipment or whatever. Judge Fitzwater basically said you didn't have enough evidence on all of this, and we'll have to decide if that's true. You have, throughout your brief, statements about the summary judgment being, I forget your word, whether it's premature usually or something like that. I don't see an actual issue where there is, you're saying the district judge was an error or not allowing continuance for more discovery or whatever else. What can you tell me about any discovery complaint that you have, and to what extent is that before us on appeal? That is to the extent that the district court ruled on this narrow issue, geographic proximity, but then swept up all the alternate paths to liability. Now, had we received proper notice per Atkins v. Salazar, we could have obtained more discovery, but we put the court and defendant on notice. This is a partial motion, and we're rather surprised when it all got swept in together considering the other forms of single sets of employment do not have a reasonable geographic proximity component. In fact, looking at that outstation employee exception for mobile work sites, which drilling rigs undoubtedly are, the Willits case, it's a ferry boat case, not ferry boats, it's barges. It consolidated 500 boats. It aggregated them, and they were operating across the Ohio River, which is hundreds of miles, so they were definitely not always right next to each other. So in terms of what more discovery we would have sought at that point, it would have been about the relative locations of each and every rig. It's difficult because they're mobile. Okay. So one other thing I wanted to address was this particular policy issue where the defendant, the appellee, has made the point that the WARN Act is really here to protect communities who are going to suffer a big loss, and upon laying off this many people, no idea where to send the required notice to the local governmental unit. Well, the nice thing is the regulations tell you where to send it, and it makes good sense. 20 CFR 639.3G says, when a covered employment site is located in more than one unit of local government, the employer must give notice to the unit to which it directly paid the highest taxes for the year preceding the year for which the determination is made. So it sort of knocks out of the water the idea that the WARN Act never contemplated a single site of employment spanning more than one community. Do we know where that was? I'm sorry? Do we know where that was? It would have been Midlands. Okay. Without a doubt, because that's where their district yard was. I mean, for all the operations, it would have been Midlands? Well, for the single site of employment in the Permian Basin, and again, that might require further refinement. What you'll get out of it is a beautiful non-fail-safe class because if you organize it based on the superintendents, this common management, you may have some classes that will fail because the WARN Act is what I call an arithmetic statute. You have to find the single site of employment, but then there has to be 50 full-time employees and full-time is defined, and it has to be 30% of the single site of employment were laid off. So like I said, the arithmetic becomes an issue. So it could be that a cluster of drilling rigs supervised by one drilling superintendent would have two rigs stacked and that wouldn't rise to WARN liability. So that class would fail while others would succeed based on the 563 people who lost their jobs. I think if you don't have anything further, I'll address anything on or above. Thank you. May it please the Court. My name is Kevin Duddleston with the law firm of McGuire Woods, and I represent the defendant, Eppley, in this case, Liveshaw Drilling. The linchpin of this case revolves around one central issue. Despite Meadows' attempt to portray this as multiple issues jumbled together, there is one single overriding theme that pervades every single theory that they advance, both at the district court level and on appeal, and that is single site of employment. Single site of employment is not defined by the WARN Act, but it is contained in the regulations that interpret the WARN Act. They're contained in the requirements for a mass layoff, for a plant closing, and as Judge Reveley pointed out, when it comes to the issue in the Signal International case, when you're dealing with this issue of truly unusual circumstances that may not have been contemplated by Congress when the WARN Act was passed, sure enough, you have an issue of geographical proximity which goes directly to the heart of single site employment. That issue itself is solely dispositive of every claim and every theory asserted, which parenthetically it's interesting to note. And this is included in our brief, so I won't harp on it, but you'll notice that the plaintiff's theory in this case continues to be a moving target. They originally filed the complaint alleging that the central location, that the single site was Tulsa, the headquarters of Ladshaw. They correctly moved on from that theory and filed the First Amendment complaint in which they are now trying to suggest that the single site of employment emanates from an aggregation of specific, distinct, varied drilling rigs which are transient in nature. The one question that comes to mind that they've never been asked, and counsel still avoided the question, is this. What is the single site of employment with respect to, number one, Mr. Meadows, the named plaintiff in this case? Number two, you can't lose sight of the fact that this case was filed as a putative class action. So if it proceeds, do you define the single site of employment as every single drilling rig aggregated together? Because if you follow the logic, for one, for Mr. Meadows, taking random rig numbers, rig six and seven, you aggregate those two together to get your threshold number of 50 employees. Well, how do you do it for the class? Do you take just Mr. Meadows' quote-unquote single site of employment that they've identified, or do you aggregate every single rig that Ladshaw ever erects and operates in the Permian Basin and define that as a single site of employment? To abide by that logic would essentially eviscerate the meaning of the WARN Act and would undermine the very purpose of the Department of Labor's regulations that specifically say they've identified single site of employment and they give guidelines on how courts are to analyze this issue. And the overriding principle in that regulation is the base assumption that multiple sites are not to be considered unless they meet three criteria, are not to be considered as single sites of employment unless they meet three criteria, geographic proximity, common purpose, and shared employees and equipment. What do you do with 20 CFR 639.3I6 that talks about workers whose primary duties require travel from point to point, who are outstationed, or whose primary duties involve work outside of any employer's regular employment sites, e.g. railroad workers, bus drivers, salespersons? They don't seem to fit within what you're talking about. Fair question, Judge Owen, and I point out the simple fact, undisputed fact in this case, a fact that they ignore, which is while these individuals are assigned to a particular rig at the whim of the operator or the customer, that is their work site. Mr. Meadows, there is no testimony from Mr. Meadows, or anyone for that matter, that they commute on a daily basis from home to the work site. These rigs are not, they're huge. They're basically factories that manufacture holes in the ground. They have living quarters. The workers that work on them. Well, salespeople go out and go out, they leave their home for a week or two at a time. Yes, Your Honor, fair enough. But what they do not do is essentially move in or move to a particular location and reside there until the work is completed. Well, some of them might. Yes, but do they do it for six months or do they do it for a year? Because that's one of the key points, which is the rig operations vary from rig to rig. You could have a rig that's constructed and is— Is there a time limit? There is no time limit, Your Honor. I think at that point you're sort of getting into a gray area. If you're going to say a rig is constructed and operates for two months, then we're going to draw a bright line there and say that the outstation— That's why I don't get the temporal limits. I didn't see that in the statute. That's why I'm asking him, why are we getting into— You're trying to draw a distinction that I don't see in the text. Well, because the outstation employee in that body of law still discusses and talks about employees who travel to remote locations to perform a job and return home. That's not what happens here. They are assigned—there are hitches and there are towers for these rigs, and when these individuals are assigned to a specific rig, that is their place of employment. They report to a rig manager who is essentially the mayor of that rig, who controls, who supervises, who does everything according to procedure and according to the client or customer contract at that work site. We're not talking about—Mr. Meadows, for example. I tried to find this in the record. It doesn't exist. Mr. Meadows testified that I think the best testimony he could provide, and this is in our brief, so I apologize if I don't have the record citation, but the best evidence he could provide was that there may have been one instance that he quote-unquote heard about where the actual drilling site was close enough for another employee to drive from his home to the work site and back home. And that's it. That's the only testimony you would have which could potentially create a fact issue based on an outstation employee. But that in and of itself does not create enough of a fact issue. I mean one hearsay employee situation does not create a fact issue. Judge Fitzpatrick got this correct. Now what they've argued is there's a paucity of case law. I beg to differ. There is a saturation over the last six or seven months in this circuit. You first have the Axis case, which was decided at the Eastern District of Louisiana in 2015. Then you have a trilogy of cases that came down within a relatively short span of time. First was the Latshaw decision when Judge Fitzwater of the Northern District of Texas ruled in our favor in May. Then you have the Patterson UTI case, another case which they don't even address in this case, and there's an interesting point that flows from the Patterson that I'll get to in a second. But you have the Patterson case decided out of the Southern District by Judge Ellison. Same logic. And then you have the Trinidad decision, which was decided out of the Western District, I believe, Judge Lambert. Are there any lawyers that are common to these cases? Very good question, Your Honor. There is, in fact. Lead counsel for Latshaw in this case was. That's all right. It doesn't matter. It's actually a point I wanted to get to, so I'll address it. Lead counsel for Latshaw in this case happens to be lead counsel for the Patterson UTI case, a case which Judge Ellison out of the Southern District ruled in favor of the driller and said that you can't. There is not enough evidence in the record, and it is impossible for a reasonable juror to find that there is a single-sided employment. He ruled. The judge actually ruled at the oral argument, which was conducted in August of 2016 last summer. And what's telling is counsel in that case happens to be counsel in this case. And there is a fatal, fatal admission made at that oral argument. And the court can consider this because this is actually on appeal. So the record on appeal is for this very court, and it's docket number 16-20604. And Mr. Vaught, lead counsel for Latshaw in this case, was asked in that case about the geographical issue. Very telling is his response to that question. He says, Your Honor, I think of the cases that we, and this is at page 3526 of that record on appeal and that docket number. Your Honor, I think of the cases that we have. This might be one of the strongest ones, referring to the Patterson case, as far as that management, supply chain, hiring and firing, payroll, and distinct narrow area as compared to Latshaw, which was completely different. He goes on to say, Everything was in Oklahoma, yet rigs operated in Arkansas, New Mexico, Texas. Most important, quote, We didn't have the facts in that case that we fortunately have in this case that would enable a fact finder to aggregate drilling rigs in each distinct operational area. Imagine ellipses. Here's the statement. We don't have the facts in that case that would enable a fact finder to aggregate drilling rigs. That sounds very much like an admission to me that there is no way they could establish, based on competent admissible evidence, that there is, in fact, a single-sided employment by trying to aggregate all of these drilling rigs. They still, to this day, they couldn't do it. They can't do it in the district court, and they can't do it here. They cannot identify what their operative site of employment is, not only for Mr. Meadows, but for the class. If you take the argument for class purposes, because I think she referred to it as a fail-safe class, if you take the argument that you just aggregate them all together, it completely, completely excises the language from the regulation adopted by or promulgated and published by the Department of Labor, which says, first, there's the assumption that multiple sites are separate sites of employment, unless you meet those three criteria. Did Judge Fitzwater get it wrong? Is his logic wrong? Is Judge Ellison wrong on this? Is Lamberth wrong on this? There's not a paucity of case law. There is an abundance of case law now within this circuit from district court judges who have thought this through. These aren't knee-jerk reactions. They've analyzed almost identical facts and have determined that there is no reasonable trier of fact that can draw a conclusion that there is an operable single site of employment that controls. One of the focuses that Meadows makes in their argument is, because I want to address a couple of specific points. I don't want to leave them unanswered, is there was a suggestion that we're asking the court to basically decide something here that Judge Fitzwater didn't decide. That's not quite correct. What we're telling the court here is there was evidence in the record to support entry of the fully dispositive summary judgment at the district court level. This isn't new evidence. This is all in the record on appeal. The standard says in the Fifth Circuit that if there's a reasonable basis for upholding it, which is not necessarily the basis that the trial court relied upon, then the court of appeals can't affirm, and in this case should affirm. Judge Fitzwater absolutely got the logic correct. So it's not as if we're asking the court to all of a sudden consider some new argument or new evidence. These arguments were placed before Judge Fitzwater, and all he had to do was get to the first one and say, geographical proximity, no. There's no evidence here to support that, and it just doesn't work. Counsel, how many employees were there at Tulsa? At where, Your Honor? At Tulsa. Wasn't that where the corporate offices were? At Tulsa? Yeah. Going from memory, I want to say that there were approximately 20, 25 corporate employees. Tulsa's basically the corporate headquarters. There weren't 50, were there? I'm sorry? There weren't 50 at Tulsa? There weren't 50 employees in Tulsa, to my knowledge. I will readily admit I could be wrong on that. It's actually not one of the facts that I focused on, because that's not their theory of the case at this point. But my understanding is there were certainly less than 50 in Tulsa, Your Honor. They also raised this issue of the discovery issue and whether or not there was error by the court not allowing. So let me clarify exactly what happened. The summary judgment motion was filed. My client filed the motion for summary judgment. Opposing counsel, the one who made the fatal concession in the Patterson case, three months after this case was decided by Judge Fitzwater, asked for a discovery extension, granted it a discovery extension. They elected not to depose the affidavits. Not only did they elect not to depose the affidavits or raise an issue of discovery abuse by Judge Fitzwater in taking up the dispositive motion with unfair prejudice to them by, quote-unquote, not being allowed to complete discovery, they offered their own motion for summary judgment. You can't have your cake and eat it too. You can't make an argument based on the record evidence and say, Your Honor, you need to rule in our favor on this, cross motion for summary judgment, and then when you lose, claim, well, this is unfair, we didn't have full discovery. They had full discovery. They had the opportunity for additional discovery. They didn't take it, and then they accepted the circumstances and the facts and the evidence that had been gathered through discovery to urge their own motion. And now they want you to say that this is unfair. That argument doesn't work. We're not arguing that the community purpose behind the Warren Act is what controls here. It's misconstrued. What we're arguing is the legislative purpose behind Warren, when it was enacted, 1988, by the way, in the Reagan administration, 80 years into this drilling industry, when it was enacted, they had an opportunity at that time, Congress did, to correct, amend, discuss, debate, go to committee, go back out of committee and submit a new bill which would specifically address this particular industry. The Department of Labor, and I don't think this is controversial to say this, but all things being equal, at least from my perspective as a defense attorney, there's a general perception that Department of Labor regulations tend to be all things equal, a little pro-employee. The Department of Labor actually has published a rule assumption that says we ought to assume, barring evidence to the contrary, that separate sites constitute separate places of employment unless you can meet those three criteria, which they don't do in this instance. There have been multiple opportunities for Congress to amend, to address this issue. It hasn't. There have been multiple opportunities for the Department of Labor to propagate and publish new rules and regulations, and they haven't. The regulatory language is quite clear in this case. Meadows can only satisfy the statutory requirements of the Trigger Warrant Act of employees at locations or drilling rigs other than his if they are aggregated together. That is undisputed in this case. What that means is if your honors decide, as Judge Fitzwater did and Judge Lamberth has and Judge Ellison did, that they cannot be aggregated together, then they lose. They cannot make a warrant claim out. That is the common theme that pervades each theory that they've asserted in their complaint. I'm not going to be so bold as to suggest to the court what it might ask Meadows in rebuttal, but the question is out there. In my mind, it hasn't been answered, and that is, how do you define the single site of employment? How do you define it for Meadows, and how do you define it for the class? We can't lose sight of the fact that this case was disposed of before the class was certified. If it was brought, which it was, ostensibly as a class action, then they have to be able to satisfy that single site of employment question under the Warren regulations, not only with respect to Meadows, but also with respect to class members. And the only way to do that is to stretch the logic and say, we're going to tie Rig 6 and Rig 7 together because Mr. Meadows was assigned here and at one point was assigned there. How do you do that for every class member? You can't unless you pull them all together. And if you do that, what you're doing is you're basically setting up a situation where a retailer, a large retailer, a large box retailer, a Walmart, has locations in Seattle and Miami and Austin and Albuquerque. If you have a regional vice president that might supervise three of those locations, that's what they're trying to get to with the superintendent issue at the Red Herring because that doesn't mean that each of those locations constitutes a single site of employment. There is no, and I believe it was Judge Southwick that raised this issue of cross-fertilization. There is no cross-fertilization. I beg Meadows to offer any record evidence on appeal that establishes that employees worked two sites at the same time. The reason they worked multiple sites is, by its very nature, a drilling rig doesn't last forever. They operate at the whim and at the discretion of the customer, the operator. That might be a couple of months, it might be a year. When that rig is deconstructed, it's stacked, they then go on and they have a contract with another customer. A new rig is erected. They man that particular rig with a workforce. They don't work and they're not borrowed from one rig to another while they are assigned. The only reason— I thought there was evidence that— What you're thinking of, Judge Owen, is there is some evidence in the record that suggests that Mr. Meadows was transferred. He was transferred, if you look at the record evidence, at the request of the customer. I'm sorry, at the request of, well, yes, of the customer because it was the company man who was on site at the drilling rig that said we don't want this individual on here. He moved to a new location. It's the equivalent of an individual moving from a Walmart store in Austin and being transferred up to Seattle. Yes, they work at both locations, but not at the same time. I assume my time is up. Thank you. I can't please the Court. Certain of the facts that were just presented are slightly misleading in terms of the sharing. There were temporary shares between Blackshaw Drilling Rigs. There were times when he was on a rig site for a day. There were times when he was on a rig site for three days. It's in the briefs. I kind of don't know where the only permanent transfers comes from. It's pretty plain on the record. The other point that came up was regarding some sort of fatal admission made during oral arguments in the Patterson case. There were different facts in the Patterson case. One of the things was, in Patterson, everyone had a rig designation on their payroll, on their pay stub. Blackshaw has unified payroll, which is actually usually indicative of a single site of employment. For instance, going back to the Viator case, when employees would go from different work sites, different retail sites, they would be paid very carefully out of that other work site's funds, their accounting. There's no evidence of that in this case. One of the things he said was that these employees would go out there for six months or a year. They were never driving back and forth from the site. They went to site for two weeks, and then they would come back. So they were driving to and from the site. The last thing, they keep harping on, no one ever worked at two sites at the same time. Well, that kind of just sounds to me like a physical impossibility. How could you work on one drilling rig and another contemporaneously? It's impossible. They're different physical sites, and that's not what the Warren Act requires. It requires shifting. It requires employees moving from site to site, which we definitely have in this case. Regarding single-site employment, it's very common to adjust class definitions during a class period based on discovery that comes about during that class period, and that was all I was suggesting in terms of it may be the superintendents who unify the drilling rigs. You say, Mr. Dillerson, it's a characterization that you got an extension for discovery and had opportunities, and whatever discovery you wanted to take, you were able to take. Why was this at all premature? Simply because it came before class certification. Without access to class data, it's very difficult to tell where the single-site employment, in fact, is. You wanted to certify a class without knowing where the single-site employment was? We had a tentative definition, but it may require refining. It would be based around the Permian Basin, the Arcoma Basin, and the Anadarka Basin, the drilling rigs there. Judge Riegel, that was one thing I wanted to clarify as well, is that there were drilling rigs working around Tulsa. The Tulsa corporate office, again, not in dispute that it didn't have many people in it, but they wouldn't be involved in that class. Any further questions? Thank you, Ron. Thank you. That will conclude the arguments for this panel this week.